FILED

97 JAN 17 PM 4:28

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

JAN 1 7 1997

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CAROLINE S. PACE,            )
                             )
     Plaintiff,              )
                             )
     vs.                     )   CV 93-PT-2461-S
                             )
UNIVERSITY OF ALABAMA        )
TRUSTEES, JIMMY NEILL,       )
individually and in his      )
official capacity, and       )
CLAUDE BENNETT, individually )
and in his official          )
capacity,                    )
                             )
     Defendants.             )

## MEMORANDUM OPINION

This cause came on to be heard on the Motion For Judgment As A Matter Of Law made by defendant Neill at the conclusion of plaintiff's evidence and the same motion by defendant Bennett at the conclusion of all evidence.[1]  This memorandum opinion addresses those two motions and plaintiff's motion for the court to reconsider the grant of said motions.

This case presents an example of the difficulty facing a court when considering motions for summary judgment in cases with multiple claims against multiple defendants and evidence covering a span of some fourteen years.  It becomes difficult to see the

---

[1] The court is also reconsidering its denial of motion(s) for summary judgment prior to trial as to all defendants.

1

trees for the forest.[2] The true relationships between parties, jobs, etc. often do not come into focus until trial.

The court confesses that, when it was considering these defendants' motion(s) for summary judgment prior to trial, it did not have a real grasp of the relationship between the Department of Medicine and the Department of Physiology and Biophysics at the University of Alabama at Birmingham (U.A.B.). Nor did the court fully understand that there was a Dean of the Medical School which included the separate Department of Physiology and Biophysics **and** Department of Medicine. The court further developed an impression that defendant Neill somehow worked for defendant Bennett in a "medical" entity.[3] In any event, the court did not have a clear picture of the relationship. It has become clear that Neill and Bennett cannot be considered in some monolithic fashion. To the contrary, they were competitors for both space and funds within the Medical School, headed by Dean Pittman and his successors, not Bennett. Bennett and Neill headed different departments within the Medical School.

This separation of entities makes two things patently obvious. One is that any claims against Neill are barred by the

---

[2]If there is a reversal of the usual saying, it is intended.

[3]The court does not claim any excuse for this confusion other than having to consider a plethora of similar cases.

2

statute of limitations. Even assuming that his suggested violations were more than garden variety business decisions in an operation where both funds and space are critical, it is clear that his role in any alleged violations ceased in 1990, more than two years prior to the filing of this action and more than 180 days prior to the filing of the EEOC charge. This separation of entities makes it clear that his alleged violations were related to his own department's concerns and his discrete actions vis a vis any concerns of Bennett and the Department of Medicine as distinguished from the School of Medicine.

The fallacy of plaintiff's attempt to structure a continuing violation theory is perhaps best illustrated by an analogy. As this judge indicated at trial, the courtroom deputy now assigned to this judge was earlier assigned to another judge of this court. Assuming violations occurred during her tenure with that judge, could it be plausibly argued that later violations by this judge would be a continuation of discrete violations of a prior judge, just because the judges are on the same court? The answer is obviously "no." The continuing violation doctrine does not require an electrical arc type leap over the gap from one 1990 department head to another department head in 1992.

Further, any alleged discrimination by Neill, if it were not earlier obvious, should have become patently obvious in 1990 when

he requested (demanded?) that plaintiff not have an appointment in his department. If his discrimination was as blatant as plaintiff suggests, it would have been obvious much earlier.[4]

The problem with such a loose application of the continuing violation doctrine is illustrated by this case. A majority of the time used by plaintiff in presenting evidence in this case related to Neill. Evidence related to barred claims against Neill and U.A.B. likely confusingly and unfairly affects the consideration of evidence against Bennett and U.A.B. as to claims which are not barred. This action was triggered by the August 1992 action. The effort to resurrect 1979-1990 complaints about Neill detracts from the real 1992 issue, assuming that the evidence is sufficient as to that issue.

Plaintiff argues that Neill's 1979-1990 actions were brought back into the "continuing" flow by his department's acceptance of the equipment from the 8th Floor Lab in August 1992. At that time, Neill, having nothing to do with the closing of the 8th floor lab, simply accepted, when offered by the Dean's office to whom plaintiff was primarily assigned, the lab equipment after

---

[4] In her complaint, plaintiff alleges that [in 1990] "Defendant Neill ultimately made life so intolerable for the plaintiff that she was forced to leave [his] department and become a faculty member at large within the School of Medicine." At that time, she would have known that there was either just a personality problem or discrimination. There is no justification for waiting and attempting to tie Neill to Bennett.

the Dean's office had determined to relocate it and had pursued prospective takers from any department. Neill obviously recognized that he did not have the best of relationships with the plaintiff and knew that his department's acceptance of the equipment would likely result in acrimony, but indicated that he was willing to take the "heat." There is absolutely no reasonable inference that he instigated the closing of the lab or the removal of the equipment. Only sophistry can make such a connection.

There is no question that Bennett instigated the 1992 action. Perhaps as early as 1985, Bennett had developed a plan to strengthen a division of the Division of Endocrinology and Metabolism in his Department of Medicine. Part of this plan was to offer a doctor, to be recruited, sufficient space in the Department of Medicine to do research related to that Division. In this connection he had repeatedly asked for space on the 7th and 8th floors of the Diabetes Building to be made available for such a Division. There is no reasonable inference that Bennett's desire to strengthen this Division had anything to do with plaintiff per se. His decision was based on his desire for space in order to strengthen the said Division.[5] The exhibits reflect

---

[5] The court has not reviewed a transcript. It writes based on its notes and memory. Any errors with regard to names, dates, departments, etc. are not likely substantive.

5

his continuing effort in this regard.

To the extent that Bennett had anything to do with the 1990 decision to reduce plaintiff's lab space in the Diabetes Building from 1,100 square feet to 150 square feet, that decision was likewise a discrete decision as to which plaintiff knew or should have known at the time was discriminatory, if it was. Such a claim is likewise barred both as to Bennett and U.A.B.[6]

With regard to August 1992, the only substantial evidence is that Bennett again requested all the 8th Floor space. Male(s) occupied much more space than did plaintiff. The Dean's office then undertook to make changes. Stark, of the Dean's office, not Bennett's office, made the decisions with regard to the space to be vacated. Stark delayed the eviction of Acton (male) because he, unlike plaintiff, had significant research projects in progress. While various people may have been skittish about raising plaintiff's ire, there is no reasonable inference that the decisions with regard to the time and manner in which her space and that of Acton would be vacated were made by Bennett.

---

[6] She certainly had as much reason to know that taking 950 feet was discriminatory as she had to know that taking 150 feet was discriminatory in 1992. This is particularly true since she alleges in her complaint that matters had become intolerable by 1990. The court does not suggest that there is any evidence of discrimination by Bennett in 1990, just that any such claim is barred.

6

Plaintiff has emphasized a statement concerning women in research made by Bennett in a deposition. The court will not repeat all of the emphasized statement or the questions and answers leading up to it. It should not, however, be considered out of context. The topic was opened with a question by plaintiff as to whether Bennett had addressed concerns of women. He proceeded to state what concerns had been addressed by a committee, consisting of at least several women. He particularly emphasized reported concerns related to young women of child bearing age. Again, the statement should be considered in context. See <u>Clark v. Coats & Clark, Inc.</u>, 990 F.2d 1217 (11th Cir. 1993).

Another example of evidence which could not create a <u>reasonable</u> inference is the following. The Dean of the Medical School's wife had, at some point, declined an offer to be head of a division within a department.[7] The argument is made that there is a suggestion of discrimination when she was not "offered" the job at a later time, even though there is no evidence that she desired the job or applied for it.[8]

---

[7] The court does not recall whether it was within the Department of Physiology and Biophysics or the Department of Medicine. If it were the former, it would be irrelevant because it would have involved Neill, not Bennett.

[8] The court also notes allusions to the number of female employees as compared to male employees without evidence of the

7

While the court submitted the August 1992 issue to the jury insofar as it relates to the Title VII claim against U.A.B., there is a significant question about various aspects of the claim. There is no substantial evidence that either Stark or Linn acted with discriminatory intent. There is no evidence that either Stark or Linn treated any male differently other than Acton, who had significant research grants.

There is further a question as to whether the court should have submitted the loss of pay issue to the jury. The evidence is undisputed that, as of 1992, plaintiff had not had any research grants approved for several years although she had applied for a significant number. During a significant part of this time, she had much more lab space than was taken in 1992. A finding that, although she had not received grants while she had 1,100 feet, and perhaps 1,300 - 1,450 feet, she would have received grants with 150 feet, would likely be unreasonable. Probably the real issue in this case has been, from the beginning, whether plaintiff was discriminated against in the manner in which her lab was closed in August 1992. The jury has decided that issue plus other issues which perhaps should has not

---

number of applications, etc. See Brown v. American Honda Motor Co., 939 F.2d 946 (11th Cir. 1991). It should also be noted that plaintiff's exhibit reflecting salaries of males and females is insignificant unless considered with the other exhibit which reflects sources.

8

been submitted to the jury, including the loss of pay issue.

The court has not attempted to restate all the evidence. The parties can further develop it.[9]


The foregoing opinion was dictated by Judge Propst.

---

[9]The law in this area is relatively clear. The court merely makes reference to <u>Isenbergh v. Knight-Ridder Newspaper Sales</u>, 97 F.3d 436 (11th Cir. 1996); <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590 (11th Cir. 1987); <u>Branson v. Price River Coal Co.</u>, 853 F.2d 768, 771-72 (10th Cir. 1988); <u>Hudson v. Southern Ductile Casting Corp.</u>, 849 F.2d 1372, 1376 (11th Cir. 1988); <u>Pace v. Southern Ry. System</u>, 701 F.2d 1383 (11th Cir. 1983); <u>St. Mary's Honor Center v. Hicks</u>, 113 S.Ct. 2742 (1993); <u>Clark v. Huntsville Bd. of Ed.</u>, 717 F.2d 525 (11th Cir. 1983); <u>Davin v. Delta Airlines, Inc.</u>, 678 F.2d 567 (5th Cir. Unit B 1982); <u>Powell v. Postmaster General</u>, 01911979, 3172/A2 (EEOC 1991); <u>Lacy v. Sec. of Treas.</u>, 01930795, 3877/B13 (EEOC 1993); <u>Gacutan v. Sec. of Army</u>, 01911096, 3039/F3 (EEOC 1991); <u>Payne v. Ill. Cent. R.R.</u>, 665 F. Supp. (W.D. Tenn. 1987); <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, ___ U.S. ___, 116 S.Ct. 1307 (1996); <u>Nix v. WLCY Radio/Rahall Comm.</u>, 738 F.2d 1181 (11th Cir. 1984); <u>Walker v. Nationsbank of Fla., N.A.</u>, 53 F.3d 1548 (11th Cir. 1995); <u>Quiller v. Barclays American/Credit, Inc.</u>, 764 F.2d 1400 (11th Cir. 1985); <u>Shroder v. Suburban Coastal Corp.</u>, 729 F.2d 1371 (11th Cir. 1984); <u>Early v. Champion Int'l Corp.</u>, 907 F.2d 1077 (11th Cir. 1990); <u>Young v. General Foods Corp.</u>, 840 F.2d 825 (11th Cir. 1988); <u>Mauter v. Hardy Corp.</u>, 825 F.2d 1554 (11th Cir. 1987); and <u>Kidder v. AmSouth Bank, N.A.</u>, 639 So. 2d 1361 (Ala. 1994); and <u>Rhodes v. Guiberson Oil Tools</u>, 82 F.3d 615 5th Cir. 1996).

In its earlier opinion, the court cited the <u>Ratliff</u> case. The language in <u>Ratliff</u> with regard to summary judgment should also be noted. Also compare <u>Grimes v. Texas Department of Mental Health, etc.</u>, 1996 WL 716996 to be reported at 102 F.3d 137 (5th Cir. 1996) and <u>Cones v. Shalala</u>, 1996 WL 685615 to be reported at 945 F. Supp. 342 (D.D.C. 1996).